IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HOPE JACKSON, | ) | CASE NO. 5:21-CV-02409-CAB |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I. Introduction

Plaintiff, Hope Jackson ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

## II. Procedural History

Claimant received SSI as a child and reapplied for eligibility upon attaining the age of eighteen. (ECF No. 9, PageID #: 86). The Commissioner of Social Security denied her request for benefits and found that Claimant was no longer disabled as of February 16, 2018. (ECF No. 9, PageID #: 86). Claimant then met with a hearing officer on February 22, 2019 (ECF No. 11 at 1) and filed a written request for a hearing which was received on March 4, 2020. (ECF No. 9, PageID #: 86). On November 20, 2020, an Administrative Law Judge ("ALJ") held a hearing

during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 9, PageID #: 86). On December 21, 2020, the ALJ issued an unfavorable decision finding Claimant was not disabled. (ECF No. 9, PageID #: 83). The ALJ's decision became final on October 29, 2021, when the Appeals Council declined further review. (ECF No. 9, PageID #: 38).

On December 27, 2021, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 11, 12, 15). Claimant asserted the following statement of legal issues:

> Did the ALJ properly evaluate the consistency of the plaintiff's allegations, did he properly evaluate the RFC pursuant to SSRs 16-3p and 96-8p, and did he provide an accurate and logical bridge between the evidence and his conclusions?

(ECF No. 11 at 1).[1]

## III. Background

### A. Claimant's Hearing Testimony

At the ALJ hearing, Claimant testified about her daily capabilities and routines. She testified that she lived with her mother and brother and only drove when one of them was present. (ECF No. 9, PageID #: 117). She maintained a checking account and could complete simple math problems to make change for a twenty-dollar bill. (ECF No. 9, PageID #: 119–20). However, Claimant testified that her mother was a payee on the checking account. (ECF No. 9,

---

[1] The SSA recently approved another application for SSI, which Claimant filed on January 18, 2022. (*See* ECF No. 15 at 1). The SSA found that Claimant was disabled as of January 2022, and Claimant argues that "[this] recent development further highlights that the Plaintiff's SSI should not have been ceased from April 30, 2018 through December 2021." (ECF No. 15 at 1–2). However, as this Court's responsibility is to determine whether substantial evidence supports the ALJ's decision in this case, the Court will not consider the new SSA finding. Moreover, the 2022 claim relates to a different period of time than the claim in this case. Thus, any consideration of that claim would be irrelevant to this case.

PageID #: 120). Besides interactions with her mother and brother, she did not interact with other family members or friends and testified that she stayed in her room most of the time. (ECF No. 9, PageID #: 126–27). Claimant testified that her mother made all her appointments, cooked, cleaned, and grocery shopped for her. (ECF No. 9, PageID #: 128).

Claimant's highest level of completed education was high school, where she was homeschooled because she could not handle full school days. (ECF No. 9, PageID #: 116, 118). Throughout high school, Claimant received As, Bs, and Cs. (ECF No. 9, PageID #: 118). She later enrolled in college but testified that she had trouble attending classes. (ECF No. 9, PageID #: 129).

Claimant testified about several jobs she held for various periods of time. She testified that she worked at Macy's, Wal-Mart, Target, Mack Trailer and Alliance to Hire but panic attacks and paranoia left her feeling "trapped" at work, causing her to leave each job. (ECF No. 9, PageID #: 120–21).

Claimant testified that she experienced a number of behavioral health problems including anxiety, paranoia, panic disorder, schizophrenia, depressive disorder, PTSD, difficulty concentrating, and long-term memory problems. (ECF No. 9, PageID #: 122, 123, 124, 126). She also stated that she was hospitalized several times as a child and spent six weeks in a hospital for psychological problems in 2019. (ECF No. 9, PageID #: 122). According to Claimant, these conditions impacted her daily life: paranoia led her to believe people were following her, and sometimes she would hear voices, although the voices ceased with medication. (ECF No. 9, PageID #: 123). The PTSD caused her to experience nightmares two times a week, and she had obsessive thoughts about failing her college classes and driving. (ECF No. 9, PageID #: 123, 129). Sometimes, Claimant had trouble getting out of bed in the morning and showering

regularly. (ECF No. 9, PageID #: 129–30). She also reported crying spells up to twice a week and experienced difficulty concentrating and completing small tasks. (ECF No. 9, PageID #: 126).

Claimant's panic attacks lasted several minutes each time and negatively impacted her breathing. (ECF No. 9, PageID #: 124). To cope, she used therapeutic coloring books, breathing exercises, and watched *Criminal Minds*, a television show. (ECF No. 9, PageID #: 124–25).

In her free time, Claimant testified that she enjoyed reading books but had not read any in the past few months before the hearing. (ECF No. 9, PageID #: 119). She also regularly worked on collages and watched YouTube videos. (ECF No. 9, PageID #: 125–26).

## B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

> Although the claimant has a long history of mental health impairments, the claimant has responded to treatment and the record supports no more than moderate limitations as detailed in the above B criteria. Mental status examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings.
>
> The claimant frequently presented to her psychiatric appointments with her mother. In December 2016, the claimant's mother reported that the claimant was doing pretty good, her moods were good, sleep was good and the claimant denied racing thoughts. (4F, 5) She further denied feeling restless, and her anxiety was ok. Her mental status examination noted her to cooperative, have good eye contact, be appropriate dressed, with normal speech, euthymic, mood congruent, goal directed thoughts, intact insight and judgment, oriented, recent and remote memory intact, (4F, 7) The claimant's provider noted that generally her psychiatric diagnoses were improved. (4F, 7) The claimant was noted to have an issue with borderline personality disorder and not knowing where truth lies. (4F, 7) The claimant feels her mom was not supportive. (4F, 7)
>
> In May 4, 2017, the claimant again reported she has difficulty getting along with mother, who she says affects her moods. (4F, 1)

4

She reported her moods to be stable, to be sleeping well but having racing thoughts. The claimant reports that she has high anxiety levels in general. Her mental status examination noted her to be appropriately dressed, with normal grooming and hygiene and speech. She had a euthymic mood, goal directed thought processes, and intact insight and judgment, with no suicidal or homicidal ideation, and was fully oriented. (4F, 3) All psychiatric diagnoses were noted to be improved over baseline, and her prescription was continued as normal. (4F, 3, 4)

October 2017 saw the claimant living independently with a roommate, albeit in a reported rough neighborhood which gives her anxiety. (8F, 2) The claimant was working at a fast food chain and at Walmart to pay her rent and car payment. (8F, 3) She had a roommate and got along well with her. The claimant's sleep was good, although she continues to have racing thoughts. Her provider noted her to remains very dramatic. The claimant was also noted to have some anxiety and to be restless. (8F, 3) Her mental status examination was grossly unremarkable, noting the claimant to have appropriate grooming, to be cooperative, have normal speech. She was noted to be a bit stressed, but have goal directed thoughts, intact insight and judgment, was alert, oriented, and had recent and remote memory intact. Her provider noted that all her psychiatric (4F, 3) diagnoses were improved over baseline except she was anxious with some issue with focus due to her anxiety. (8F, 4)

During a consultative examination in January of 2018, the claimant reported working full time and denied having difficulty in understanding the tasks at work, and denied issues with attention. (6F, 2) She reported getting along well with coworkers. (6F, 2) The claimant did report quitting a job of two years at Wendy's and could not state a reason why. (6F, 2) The claimant was living with a roommate, had at times low motivation to shower. The claimant reported her roommate does the shopping and cooking and said she is able to do these things, but is worried she would mess things up. The claimant reported being able to drive, and remembers her appointments and to take her medication. She likes to run, read and write. She reported some fatigue but said it was mainly being tired from work. (6F, 3) The consultative examiner noted that she was clean and neat and had come directly from work, was cooperative and polite. (6F, 4) She was noted to have an average range of intelligence. (6F, 4)

In February 2018, the claimant reported resigning from her job due to anxiety and that she was having daily anxiety attacks and was going to start with a counselor within the week. She was still living

on her own, had some irritability and frustration, although she was sleeping well., (8F, 6) Her provider noted that she "remains very dramatic" but was maintaining living on her own, had better relationships with her mom, and was a bit restless (8F, 7) The mental status examination noted appropriate grooming, normal speech, goal directed thoughts, intact insight and judgment, alert and oriented, recent and remote memory intact. (8F, 8) Her attention and concentration was intact. (8F, 8) All of her psychiatric conditions were improved over baseline despite some panic and the lost job. (8F, 9)

In March of 2018, the claimant reported several emergency room visits with no admissions to psychiatric facilities. (8F, 11) Despite presenting to the emergency room, that same month the claimant decided to travel to Texas with her sister. (8F, 12) The claimant reported further strain with her relationship with her mother. (7F, 4) The claimant had asked for a new evaluation and was diagnosed with post-traumatic stress disorder, panic disorder, and generalized anxiety disorder. (7F, 5) Later in March, the claimant reported an attempted overdose, although she does not remember taking the medication. (8F, 13) The claimant reported liking her boyfriend, having good sleep, still living on her own, continued anxiety and racing thoughts. (8F, 14) The claimant's mental status examination noted her to have appropriate grooming, to be cooperative, anxious and otherwise unremarkable findings. (8F, 15) The claimant also reported she decided she did not want to use any medication for her mental health. (8F, 15) The claimant also disputed her borderline personality diagnosis and wanted to change providers. (8F, 15)

The claimant reported in June 2018 that she was having severe panic attacks, was still sleeping good, but having irritability, anger and crying spells. (8F, 17) She was still living on her own. Her mental status examination was grossly unremarkable with noted appropriate grooming, normal speech, although with a somewhat fearful and anxious mood. (8F, 18, 19) Her conditions were noted to be at baseline, although some concern with regard to anxiety. (8F, 19)

In November 5, 2018, the claimant reported she was doing better, and was able to manage better with her prescription for Prozac. The claimant reported doing very well in college, continues to study zoology and says she enjoys her classes. She reports cooking a lot; maintaining living on her own with her boyfriend; and was noted to be less dramatic currently. (12F, 9) Her provider noted that she is doing fantastically, and all diagnoses are improved over

6

baseline. (12F, 11)

The claimant in February 4, 2019, was continuing her zoology studies while taking full time classes, which although was somewhat hard for her grades are good. (15F, 34) The claimant reported low energy, fatigue, reports racing thoughts, low mood and isolating. She reported that she at times cannot go to her classes or focus on schoolwork, although she was living on her own with her boyfriend and doing well. The claimant did not to be seen for another three months. (15F, 34)

The claimant did have a hospitalization in October of 2016 through November 26, 2019. On admission, she had disorganized speech, psychomotor retardation, catatonic-like symptoms, non-spontaneous speech, significant paranoia and delusional content; required prn meds to help her calm initially upon admission; (13F, 1) The claimant's toxicology screen was positive for barbiturates and marijuana (13F, 1) On presentation had difficulty with attention, pscychomotor retardation, staring straight ahead, mood was irritable, easily agitated, some suicidal thoughts, appeared internally stimulated; judgment and insight impaired. (13F, 1) The claimant improved to discharge and at that time she had some psychomotor agitation, slightly withdrawn with flattened affect, but was cooperative with good eye contact. (13F, 3) She was alert and oriented, improved mood, no overt paranoia or delusional content present. (13F, 3) The claimant had improved interaction with peers on the unit. (13F, 3) Her treatment goals were met. (13F, 3) The claimant at discharge was diagnosed with [sic] paranoid schizophrenia. (13F, 3) However, as detailed in the following, the claimant's regular treatment providers find no basis for the diagnosis of schizophrenia.

Directly following her discharge, in December 2, 2019 the claimant's provider doubted that she has schizophrenia; rather she believes that the hospitalization was a shift from borderline personality disorder or her bipolar disorder into psychosis. The provider noted that the claimant was overmedicated. Although advised by her regular provider, both the claimant and her mother were convinced she had the diagnosis and did not want to lower her antipsychotics, (15F, 32) Her provider recommended more intense follow up after the hospitalization and continued to note improvement as the month went on. The claimant was living in her mother's house after hospitalization. The claimant was noted to be not as drugged up, was denying hallucinations, sleeping soundly and not anxious, but somewhat restless. (15F, 24) Later in the month the claimant and her mother were still convinced of a

schizophrenia diagnosis, the claimant had no sign of psychosis and her provider began to decrease the antipsychotics. (15F, 20) The claimant was noted to have a very poor concept of who she is and to act as if she were helpless (15F, 21) As the claimant had just gotten out of the hospital she was encouraged to remain living with her mother. (15F, 27) At the end of the month the claimant reported feeling paranoid, however her provided counseled her that what she labels as paranoia was really anxiety. (15F, 18) The claimant was also noted to still be overmedicated and her provider noted that the high dose of antipsychotic medication was interfering with her logical thinking. (15F, 18) Her mental status examination noted her to have appropriate grooming, to be cooperative, euthymic, have goal directed thought, normal speech, no paranoia, no hallucinations, appeared drowsy, did have poor insight and judgment, was oriented, with intact memory, and somewhat impaired attention. She was noted to be more alert on less Invega, and have no paranoia. The claimant's mother reported that a home health screener opined that the claimant qualified for developmental disability assistance, but her provider "did not see how." (15F, 17)

The claimant's condition continued to improve and in January 6, 2020 while she did remain restless and have a hard time sitting still, her mother reported no paranoia since her last appointment, (15F, 10). The claimant's speech was organized, she had good sleep, but some irritability, and complained of poor attention and memory problems. (15F, 11) Again, her mental status examination was grossly unremarkable noting appropriate dress, grooming, cooperative, and good eye contact, with normal speech, no hallucinations, poor insight and some drowsiness. The claimant was over sedated but less than her previous visit. She was oriented, and with intact memory. (15F, 12) Her provider noted that overall the claimant's clarity of thinking was improving on the lower doses of Invega. The claimant reported that she was having trouble focusing, but the provider opined it was likely because of the dopamine blockade. (15F, 13)

In January 20, 2020, she reported feeling tired, restless and had racing thoughts. (15F, 6) The claimant also reported being less paranoid than she had been, denied auditory and visual hallucinations, had organized speech. She had good sleep, some reporting of mood swings, but reported be much less anxious. (15F, 8) Her mental status examination noted appropriate dress, grooming, hygiene, good eye contact, cooperative, normal speech, euthymic mood, goal directed thought process, no paranoia or auditory or visual hallucinations; poor insight and judgment, alert,

oriented, intact memory. (15F, 8) The claimant was noted to have done well tapering down her antipsychotic and her provider was going to stop it. (15F, 9) Notably, if the claimant was more severely ill this medication would likely not be ceased.

The claimant was reported in February 3, 2020 to be angry with her bipolar diagnosis and to be in disagreement with it. She reported being much less paranoid, to have good sleep, but some sadness. The claimant's mother says the claimant's moods are stable. She had a normal rate of speech, no grandiosity, was irritable and quick to anger, and complained of poor attention and memory problems, although she denies restlessness. The claimant reported a panic attack two days ago. (15F, 1, 2) Her mental status examination noted appropriate dress, grooming, cooperative, good eye contact, normal psychomotor activity, normal speech, irritable mood. Very notably her provider reported more clear thinking for the claimant than she had seen in a long time, with no paranoia, or auditory or visual hallucinations. The claimant did have poor insight, was oriented, and had intact memory. The claimant became angry with the provider because she would not give the claimant a diagnosis of attention deficit or attention deficit hyperactivity disorder. The provider explained to her that she had never complained of poor concentration before. (15F, 3) The claimant was upset and told the provider that she needed this diagnosis to qualify for Board of Development Disorders resources. The provider advised her she was able to seek a second opinion as she also did not agree with a diagnosis of schizophrenia. The claimant reported she had a "seizure" and the provider explained what psychogenic epileptiform seizure is and recommended seeing a medical doctor if she had further issues. The record reflects no visits or mention of the same anywhere else. The provider again noted that there was no evidence of schizophrenia, and the claimant had much more clear thought. (15F, 4)

In April 7, 2020, the claimant returned to counseling after a long-term absence of 1 plus years. The claimant was noted to be (16F, 9) seemingly well composed, but this was a telephonic session and the provider noted it was somewhat difficult to evaluate, with some demonstrations of anxiety. Yet the claimant was also laughing, and seemed to have a positive outlook. (16F, 10) The claimant was further noted to be very composed and well balanced during the phone call. (16F, 10) The following month the claimant was able to think about a five year, future oriented plan and had more moments of laughter during the session. (16F, 6) The medical record again notes in June 30, 2020 that the claimant's provider

> cannot support a diagnosis of schizophrenia. She was told that she
> did not meet the criteria. (16F, 2)

(ECF No. 9, PageID #: 91–95).

## C. Opinion Evidence

### 1. State Agency Opinions

#### a. Dr. Natalie Meyer – Consultative Examiner – January 24, 2018

Dr. Meyer evaluated Claimant in January 2018 after a referral from the Ohio Division of Disability Determination. (ECF No. 9, PageID #: 495). She offered the following diagnoses for Claimant: generalized anxiety disorder, bipolar disorder, anorexia nervosa (per records), and borderline personality disorder (per records). (ECF No 9, PageID #: 500).

Dr. Meyer made several functional assessments. She found that Claimant was "able to care for herself and her home" and had no difficulties following conversation or responding to direct questions. (ECF No. 9, PageID #: 499). She noted that Claimant denied having any difficulties understanding academic information and planned to attend college in the fall. (ECF No. 9, PageID #: 499). In her appointment with Dr. Meyer, Claimant denied any difficulties understanding directions at work. (ECF No. 9, PageID #: 499). Dr. Meyer observed that Claimant's concentration skills were "at least marginally adequate," but depression and anxiety may impact her concentration and attention. (ECF No. 9, PageID #: 500). Claimant reported no difficulties interacting with others and reported good relationships with family and friends. (ECF No. 9, PageID #: 500). However, Dr. Meyer noted that she "may have some difficulties interacting with others or maintaining relationships with coworkers and others" because of her history of personality disorder. (ECF No. 9, PageID #: 500). Overall, Dr. Meyer concluded that Claimant responded appropriately during the examination and was able to identify strategies for managing stress. (ECF No. 9, PageID #: 500). But she also noted that work pressure may result

10

in increased anxiety, discomfort, or other behavior that may impact Claimant's ability to cope with external pressures. (ECF No. 9, PageID #: 500).

The ALJ found Dr. Meyer's opinion persuasive. (ECF No. 9, PageID #: 96).

### b. Dr. Kristen Haskins, Psy.D. – State Agency Reviewing Psychologist – February 16, 2018

Dr. Kristen Haskins, Psy.D. completed a disability determination explanation in February 2018, reviewing Claimant's work history, social history, and health. (ECF No. 9, PageID #: 142–57). Dr. Haskins found that Claimant had anxiety and obsessive-compulsive disorders; depressive, bipolar and related disorders; eating disorders; and personality disorders. (ECF No. 9, PageID #: 152). She also found that Claimant did not meet the "C Criteria" of the listings. (ECF No. 9, PageID #: 152). While Dr. Haskins found that Claimant was moderately limited in her ability to maintain attention and concentration for extended periods, she found no limitations in Claimant's ability to carry out short and simple instructions. (ECF No. 9, PageID #: 154). She found Claimant had moderate restrictions in her ability to complete a normal workday and workweek without interruptions from psychological symptoms. There were also moderate restrictions on her ability to perform at a consistent pace with unreasonable rest periods. (ECF No. 9, PageID #: 155). Dr. Haskins found that Claimant had moderate restrictions on her ability to interact with the public and get along with peers. (ECF No. 9, PageID #: 155). Dr. Haskins concluded that Claimant was not limited to unskilled work and that

> the current medical evidence shows your symptoms are now being reasonably well controlled with medications and therapy. It appears that you are able to understand and carry out multi-step instructions. You can get along fairly well with other people, and you can tolerate moderate levels of stress and pressure. Your conditions result in some limitations in your ability to perform work related activities but are not severe enough to prevent you from working.

11

(ECF No. 9, PageID #: 157). Ultimately, Dr. Haskins recommended a cessation of disability status. (ECF No. 9, PageID #: 157).

The ALJ found Dr. Haskins's opinion persuasive. (ECF No. 9, PageID #: 96).

### c. Dr. Deryck Richardson – State Agency Reviewing Psychologist – August 11, 2018

Dr. Deryck Richardson, Ph.D. completed mental RFC assessment on August 11, 2018. (ECF No. 9, PageID #: 566-569). Dr. Richardson opined that Claimant was markedly limited in her ability to maintain attention and concentration for extended periods. (ECF No. 9, PageID #: 566). In all other areas, Dr. Richardson opined that Claimant had moderate limitations, no significant limitations, or no evidence of a limitation. (ECF No. 9, PageID #: 566-67). Dr. Richardson concluded that

> The claimant is likely to have difficulty with complex tasks but she is able to sustain attention and concentration to carry out short cycle tasks in a setting that does not have fact paced demand. Claimant is able to handle brief and superficial coworker contact and ordinary levels of supervision found in a customary work setting. Claimant can work within a set routine where major changes are explained in advance and gradually implemented to allow the claimant time to adjust to the new expectations. The claimant's ability to handle routine stress and pressure in the work place would be reduced, but adequate to handle tasks without strict time limitations or production standards.
>
> [ ]
>
> […] with ongoing treatment and medication, as well as improved living situation and securing a job, the claimant's symptoms appear to be relatively well controlled. [ ]

(ECF No. 9, PageID #: 568-69).

The ALJ found this opinion persuasive except that only moderate limitations in understanding, remembering or applying information. (ECF No. 9, PageID #: 96).

### 2.  Dr. Thomas Reynolds – Claimant's Treating Psychiatrist

Claimant has an extensive treatment history with Dr. Reynolds. He began seeing her in December 2009 as a child and continued to see her regularly through February 2020. (ECF No. 9, PageID #: 512-531, 572-589, 606-642). On March 26, 2019, Dr. Reynolds wrote a letter stating that Claimant "has been unable to maintain employment or be successful in an academic setting. This is a chronic condition with frequent relapses. Unfortunately, vocational training will not correct this." (ECF No. 9, PageID #: 570). On December 3, 2019, Dr. Reynolds wrote a letter stating that Claimant required "24 hour support and supervision." (ECF No. 9, PageID #: 790). On January 6, 2020, Dr. Reynolds noted that her anxiety was "much worse" since moving in with her mother but that she "can't care for herself and needs to be there right now." (ECF No. 9, PageID #: 618). By late January 2020, Dr. Reynolds wrote that he had not seen any signs of paranoia or psychosis. (ECF No. 9, PageID #: 614). On February 3, 2020, Dr. Reynolds wrote that Claimant was angry he had not diagnosed any attention disorders. (ECF No. 9, PageID #: 608). He also wrote that he saw no evidence of schizophrenia, and all other psychiatric condition were the same as the last visit. (ECF No. 9, PageID #: 609).

The ALJ found Dr. Reynolds's opinions unpersuasive. (ECF No. 9, PageID #: 96).

### 3.  Dr. Iman Melhem – Claimant's Treating Psychologist

Dr. Melhem treated Claimant from February 2020 to July 2020 and completed a mental source assessment for Claimant's on June 15, 2020. (ECF No. 9, PageID #: 602–05, 662–74, 679–91). In the report, Dr. Melhem indicated that Claimant would have difficulties in every functional area: understanding and memory, sustained concentration and persistence, social interaction, and adaption. (ECF No. 9, PageID #: 603–04). He also indicated that Claimant would be absent for more than four days a month, off task over twenty percent of the time, and

require over four unscheduled breaks a day. (ECF No. 9, PageID #: 604). Dr. Melhem concluded

that he did "not believe [Claimant] would at this level of functioning be able to hold a job." (ECF

No. 9, PageID #: 605). He wrote that Claimant "has a chronic illness that affects functioning and

adaptability which limits her ability to carry on job functions. Schizophrenia has a long-term

declining course and frequently patients with that diagnosis are unable to carry a job

successfully." (ECF No. 9, PageID #: 605).

The ALJ found Dr. Melhem's opinions unpersuasive. (ECF No. 9, PageID #: 96–97).

## IV.     The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 1. The claimant attained age 18 on June 23, 2017, and was eligible
> for supplemental security income benefits as a child for the month
> preceding the month in which she attained age 18. The claimant
> was notified that she was found no longer disabled as of February
> 16, 2018, based on a redetermination of disability under the rules
> for adults who file new applications.
>
> 2. Since February 16, 2018, the claimant has had the following
> severe impairments: schizophrenia/paranoid schizophrenia, autism
> spectrum disorder and Asperger's syndrome, post-traumatic stress
> disorder, depressive disorder, bipolar disorder, anxiety and panic
> disorder, borderline personality disorder, mild intellectual
> disability and anorexia nervosa. (20 CFR 416.920(c)).
>
> 3. Since February 16, 2018, the claimant did not have an
> impairment or combination of impairments that meets or medically
> equals the severity of one of the listed impairments in 20 CFR Part
> 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and
> 416.926).
>
> 4. After careful consideration of the entire record, I find that since
> February 16, 2018, the claimant has had the residual functional
> capacity to perform a full range of work at all exertional levels but
> with the following nonexertional limitations: The claimant can
> perform simple, routine and repetitive short cycle tasks, but cannot
> perform tasks which require a high production rate pace such as
> assembly line work. She can make only simple work-related

14

decisions, and should not be responsible for the safety or welfare of others. She can interact on an occasional basis with supervisors and a small group of familiar coworkers, with no more than incidental interaction with the general public, and should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others. The claimant can respond appropriately to occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

10. The claimant's disability ended on February 16, 2018, and the claimant has not become disabled again since that date (20 CFR 416.987(e) and 416.920(g)).

(ECF No. 9, PageID #: 89, 90, 98).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial

evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen*, 800 F.2d at 545).

However, even when there is substantial evidence, " 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.' " *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)). Similarly, an ALJ's decision cannot be upheld, "even if there 'is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.' " *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *see also Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544–546 (6th Cir. 2004) (finding it was not harmless error for the ALJ to fail to make sufficiently clear why he rejected the treating physician's opinion, even if substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion.)

**B.  Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the

claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

**C. Discussion**

Claimant raises three issues on appeal: 1) whether the ALJ properly evaluated the consistency of the Claimant's allegations; 2) whether the ALJ properly evaluated the RFC pursuant to SSRs 16-3p and 96-8p; and 3) whether the ALJ provided an accurate and logical bridge between the evidence and his conclusions. (ECF No. 11 at 1).[2]

---

[2] Each issue seemingly includes various subparts, which Claimant attempts to clarify in her reply brief (ECF No. 15 at 2). First, Claimant argues that the ALJ erred at step three of the sequential analysis by finding that Claimant's impairments do not meet or equal a listing because: a) the conclusion is based on the ALJ's "misconstruing and mischaracterizing of the record evidence" and b) "the ALJ failed to build an accurate and logical bridge between the evidence and his conclusions." (ECF No. 15 at 2). Second, Claimant argues that the ALJ erred: by a) finding persuasive the State Agency reviewing opinions because they had not reviewed the majority of the medical record; b) failing to render an RFC consistent with the opinion Dr. Meyer's, which he found persuasive; and c) failing at step five to build an accurate and logical bridge between the evidence and the conclusions. (ECF No. 15 at 2). Third, Claimant argues that a) the ALJ's credibility analysis violated SSRs 96-8 and 16-3; and b) the ALJ "played doctor" when he determined that Claimant had shown improvement and failed to build an accurate and logical bridge between the evidence and this conclusion. (ECF No. 15 at 2).

This Court finds merit in Claimant's argument that the ALJ failed to build a logical bridge between the evidence and his decision to find the state agency opinions persuasive. Claimant asserts that the ALJ erred by finding persuasive the opinions of the state agency reviewing consultants because these opinions were rendered "long before most of the evidence was in the record, including the opinions" of Claimant's treating psychiatrists. (ECF No. 11 at 22). The state agency reviewing opinions were given on February 16, 2018 (ECF No. 9, PageID #: 154-56) and August 11, 2018 (ECF No. 9, PageID #: 566-69), over two years prior to the ALJ's decision dated December 21, 2020. Despite this, the ALJ found the opinions persuasive except for Dr. Richardson's opinion that Claimant was more limited in her ability to understand, remember, or apply information. Relying on *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407–09 (6th Cir. 2009), Claimant argues that "[g]iving more weight to a non-examining opinion can be basis for reversal and remand when the non-examining doctor did not have the benefit of reviewing the opinions of the treating source(s)." (ECF No. 11 at 22). The Commissioner does little to address this argument in any meaningful way, merely restating the ALJ's decision and stating that the Claimant seeks for this Court to reweigh evidence. (ECF No. 12 at 21-22).

In *Blakley*, the Sixth Circuit provided that, where an ALJ gives great weight to State Agency reviewing sources who did not have the opportunity to review the full record, "we require some indication that the ALJ at least considered these facts before giving greater weight

---

The Court notes that Claimant's merit brief did not comply with this Court's Initial Order requiring separation of the legal issues. (*See* ECF No. 7 at 2). This Court explained that the briefing requirements "are intended to allow each side to identify all essential facts upon which their position is based, to argue for their interpretation of how the law should be applied to those facts and to eliminate the requirement that the court search the record for facts not identified by the parties as essential to the determination of the case." (ECF No. 7 at 2). Although Claimant's reply brief purportedly attempted to clarify the issues presented, the order of the presented/clarified issues does not coincide with the vague issues identified in the initial brief.

to an opinion that is not based on a review of a complete case record." 581 F.3d 399, 409 (6th Cir. 2009) (internal quotation marks omitted) (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007) (quoting SSR 96–6p, 1996 WL 374180, at *3)). "While this case law is not strictly applicable under new regulatory standards, the concepts are nevertheless appropriately considered [in post-March 2017 disability applications.]" *McQuade v. Comm'r of Soc. Sec.*, No. 1:21-CV-00834, 2022 WL 3280151, at *15–16 (N.D. Ohio June 2, 2022), *report and recommendation adopted in part, rejected in part sub nom.*, No. 1:21CV834, 2022 WL 4375984 (N.D. Ohio Sept. 22, 2022) (citing *Book v. Comm'r of Soc. Sec.*, No. 2:20-CV-13027, 2022 WL 1212146, at *1, 8 (E.D. Mich. Apr. 25, 2022) (applying the case law under new regulatory standard); *Michelle A. v. Comm'r of Soc. Sec.*, No. 1:20-CV-700, 2022 WL 908859, at *1, 7–10 (S.D. Ohio Mar. 29, 2022) (same)). Further, "'[i]n appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.'" *Id.* (quoting SSR 96–6p, 1996 WL 374180, at *3). The *Blakley* Court found that the ALJ's decision to accord greater weight to state agency physicians than the treating sources was not, by itself, reversible error. *Id.*

Nonetheless, an ALJ must "articulate how he considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* § 404.1520c(a). In doing so, the ALJ is required to explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. *Id.* § 404.1520c(b)(2). Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." *Id.* §§ 404.1520c(c), 404.1520c(b)(2) ("The factors of supportability [] and

consistency [] are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . ."  Additionally, the decision must still build and accurate and logical bridge between the evidence and the conclusion. *Fleischer,* 774 F. Supp. 2d at 877. Here, the ALJ explained that he found the state agency opinions persuasive because:

> they are acceptable medical sources with knowledge of and experience with the social security benefits programs whom had the opportunity to independently and thoroughly review the records before them, although they did not have the benefit of a treating relationship with the claimant or the records received at the hearing level. However, the evidence of record developed after they rendered their opinions did not change materially or in a manner that would otherwise render their opinions inconsistent with the record generally. The record does support, however moderate limitations in understanding, remembering or applying information, as detailed in the above paragraphs.

(ECF No. 9, PageID #: 96).

The Court cannot make sense of the ALJ's explanation finding these opinions persuasive. First, the ALJ says nothing about the consistency or supportability of the medical opinions as they stood at the time they were rendered; thus, little sense can be made of how later developed evidence did not alter them. Second, the ALJ's explanation is nothing more than a conclusory statement and nothing elsewhere in the decision sheds light on the explanation. The ALJ fails to include even a basic explanation of what Dr. Haskins's and Dr. Richardson's opinions are. Although the ALJ suggests that the opinions are not inconsistent with the later records, without some mention of the opinions at issue, it is not possible to evaluate this conclusory statement. Simply put, the ALJ failed to build an accurate and logical bridge between the evidence and his decision to find the opinions persuasive following the introduction of over two years' worth of additional medical evidence including opinions of her treating psychiatrists who opined that she had greater limitations than those included in the RFC.

As a result, the ALJ's decision does not allow for an adequate review by this Court. Accordingly, the matter should be remanded. *See Wylds v. Comm'r of Soc. Sec.*, No. 3:21-CV-00365-JGC, 2022 WL 1541928, at *10 (N.D. Ohio Mar. 2, 2022) ("Because the ALJ's opinion does not permit the Court to follow the "reasoning and treatment of" opinion evidence in the record, the Commissioner's decision must be vacated and remanded for further proceedings."), *report and recommendation adopted*, No. 3:21-CV-365-JGC, 2022 WL 1539266 (N.D. Ohio May 16, 2022).

As this matter is already being remanded for error in the treatment of the state agency reviewers' opinions, in the interest of judicial economy, the Court declines to reach the remaining arguments.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

Dated: October 14, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530–31 (6th Cir. 2019).